IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| DAVID MARINAC, et al., | ) | Case No. 1:20-cv-1571 |
| | ) | |
| Plaintiffs, | ) | |
| | ) | MAGISTRATE JUDGE |
| v. | ) | THOMAS M. PARKER |
| | ) | |
| DARYL Z. TODD, et al., | ) | |
| | ) | **MEMORANDUM OPINION** |
| Defendants. | ) | **AND ORDER** |
| | ) | |

Pending before the court are two motions to dismiss the third amended complaint filed by plaintiffs David Marinac, ABC Packaging Direct, LLC ("ABC"), and International Merchandising Group, Asia, Limited ("IMGA") (collectively "plaintiffs"), one filed by Millcraft Paper Company ("Millcraft"); and the other filed by Daryl Z. Todd ("Todd"), Michelle Todd, Stephanie Patterson, Robert Holt, and Sarah Dinunzio (all collectively "defendants").  ECF Doc. 83; ECF Doc. 85.  Both motions argue that plaintiffs have failed to state a claim upon which relief may be granted under the Racketeer Influenced and Corrupt Organization Act of 1970 ("RICO"), without which they contend this court lacks a basis for subject matter jurisdiction over this action.

On the record now before the court, defendants' motions must be GRANTED and plaintiffs' complaint must be DISMISSED.

I.    **Factual Background[1]**

ABC is an Ohio corporation owned by David Marinac that sells and markets custom-printed packaging products for the retail packaging industry.  ECF Doc. 73-1 at 3–4.  ABC sources its products from Asia through IMGA, which is located in Hong Kong.  ECF Doc. 73-1 at 3, 5.  In May 2018, Marinac entered into an agreement with IMGA's owner (Todd) and non-party David Zuber, by which: (i) Marinac obtained 65% of IMGA; (ii) Zuber obtained 10% of IMGA; and (iii) Todd retained 25% of IMGA and was named ABC's chief operating officer.  ECF Doc. 73-1 at 5.

Sometime later, Marinac identified Millcraft (an Ohio-based paper and packaging distributor) as a potential client for IMGA.  ECF Doc. 73-1 at 6.  And in January 2020, Millcraft entered into two contracts: (i) a January 8, 2020 independent contractor agreement with Marinac; and (ii) a January 13, 2020 independent contract agreement with IMGA.  ECF Doc. 73-1 at 6, 30–34, 36–39.

Per his contract, Marinac agreed to help Millcraft develop a business plan to sell packaging products and supplies and oversee Millcraft's sales operations from January 15, 2020 to December 31, 2020 in exchange for a monthly retainer of $8,330.  ECF Doc. 73-1 at 6, 30.  If the business generated through ABC/IMGA increased Millcraft's gross profits by $750,000 over the previous calendar year, Millcraft further agreed to pay Marinac a $50,000 bonus and increase his monthly retainer to $12,500 for the remainder of the contract duration.  Id.

Under Millcraft's contract with IMGA, IMGA agreed to help Millcraft source products from suppliers throughout Asia.  ECF Doc. 73-1 at 7, 36.  In return, Millcraft agreed to pay

---

[1] The recitation of facts in this section derives from plaintiffs' third amended complaint (ECF Doc. 73-1), which we must construe in a light most favorable to plaintiffs.  *Neogen Corp. v. Neo Gen Screening, Inc.*, 282 F.3d 883, 893 (6th Cir. 2002).

IMGA a $15,000 set-up fee and a monthly retainer, the value of which would be determined based on the annual dollar amount purchased through factories sourced through IMGA (between $5,000 and $25,000).  ECF Doc. 73-1 at 36–37.

Meanwhile, Todd "wreaked havoc on ABC" by failing to perform his duties as chief operating officer.  ECF Doc. 73-1 at 7.  Todd told "bank, customers, employees, etc.," however, that Marinac was to blame.  *Id.*  And Todd attempted to reclaim control of and return to managing IMGA, but Marinac refused.  *See* ECF Doc. 73-1 at 7, 11.  Todd ultimately concocted a scheme by which he could: (i) leave IMGA and ABC; and (ii) "take their business and defraud his partners by opening a secret competing business."  ECF Doc. 73-1 at 7.

To further his scheme, Todd recruited several ABC and IMGA employees or agents: (i) Agnes Chun and Alfred Ting, who handled IMGA's overseas activities (e.g., bookkeeping, purchase orders, and payments); (ii) Patterson (Todd's daughter), who organized shipping logistics for ABC; (iii) Holt, who worked as a sales representative for ABC; and (iv) Dinunzio, who worked as a sales assistant and warehouse supervisor for ABC.  *See* ECF Doc. 73-1 at 3, 5, 8–9, 11–12.  Todd coordinated his efforts through email correspondence and "instant messages utilizing free VOIP applications."  ECF Doc. 73-1 at 9.  Todd used an email address designed to give the impression that it was affiliated with IMGA: dztoddimga@yahoo.com.  *Id.*

Todd instructed Chun and Ting to form APSL and to cease communication with Marinac.  ECF Doc. 73-1 at 8, 15.  Todd also told Holt and Dinunzio to pressure Marinac to resign and give up his ownership interest in IMGA.  ECF Doc. 73-1 at 16.

Todd then attempted to sway Millcraft away from IMGA and Marinac.  *See* ECF Doc. 73-1 at 7–8.  Todd told Millcraft that IMGA and Marinac were unable to perform their obligations under the independent contractor agreements, that Marinac was engaged in

misconduct, and that ABC was on the brink of financial ruin.  ECF Doc. 73-1 at 8.  Todd urged

Millcraft to cancel its contracts with Marinac and IMGA and to switch its business over to

APSL.  ECF Doc. 73-1 at 10.  And Todd proposed that he assume Marinac's duties under the

January 8, 2020 independent contractor agreement.  Id.  Millcraft agreed to Todd's proposals and

to finance the formation of APSL.  ECF Doc. 73-1 at 8.

On the second line: Todd also took steps to divert new business away from IMGA to APSL.  Id.  As an

example, the complaint alleges that Todd instructed Ting to provide quotes to a new prospective

client that would direct business through APSL instead of IMGA.  ECF Doc. 73-1 at 10.  Holt

and Dinunzio were alleged to have also helped divert business away from ABC, though the

complaint did not say in what way.  ECF Doc. 73-1 at 20–21.  Patterson instructed ABC's

suppliers to refrain from shipping product and/or demand payment up front.  ECF Doc. 73-1 at

20.

On May 5, 2020, Todd sent an email to Patterson, Chun, Ting, and several IMGA

employees, informing them of his intention to resign from ABC and form APSL.  ECF Doc. 73-1

at 11.  Todd stated that he had no option but to form APSL because Marinac: (i) had refused to

speak with Todd and Patterson; (ii) had not attempted to sell packaging products for three years,

focusing instead on unprofitable ventures; and (iii) had taken large sums of money from IMGA

to "enhance" his lifestyle, which had "starved the company."  Id.  Todd stated that Millcraft had

already agreed to work with APSL going forward as its first customer and that APSL would be

run like IMGA.  Id.  Todd explained that the plan was to have the IMGA employees resign with

him and be rehired by APSL.  Id.  Todd instructed the IMGA employees that ABC projects and

4

securing new orders were not a priority.  ECF Doc. 73-1 at 12.  Instead, Todd provided a list of instructions that would apply to potential future orders for APSL.  ECF Doc. 73-1 at 11–12.[2]

On May 22, 2020, Todd resigned from ABC.  ECF Doc. 73-1 at 27.  On May 29, 2020, Dinunzio, Holt, Patterson, Chun, and Ting resigned from ABC and IMGA.  ECF Doc. 73-1 at 12.  Patterson thereafter provided logistics services for APSL.  ECF Doc. 73-1 at 9.  Patterson, Dinunzio, and Holt also helped set up APSL's website.  ECF Doc. 73-1 at 9, 14–15.  On June 17, 2020, Todd informed Millcraft that APSL was incorporated.  ECF Doc. 73-1 at 13.

The complaint further alleged that, as of the time of filing, Millcraft continued to work with APSL and offer products through APSL which otherwise would have been sourced through IMGA under the terms of the independent contractor agreement.  ECF Doc. 73-1 at 16–17.  The complaint also alleged that Todd and Ting were forced to use IMGA's bank account to operate APSL, which furthered their scheme because IMGA customers and factories did not have to divert payments to another bank account.  ECF Doc. 73-1 at 15.  Funds were then redirected to other overseas bank accounts, depriving IMGA and ABC of profits.  ECF Doc. 73-1 at 9, 17.

## II.   Relevant Procedural History

On July 16, 2020, plaintiffs filed a complaint against Todd, Michelle Todd, Patterson, Dinunzio, Holt, and two John Doe companies.  ECF Doc. 1.  On August 20, 2020, plaintiffs filed their first amended complaint, which added APSL as a defendant.  ECF Doc. 11-1; *see also* Docket Entry dated 9/25/2020.  On February 18, 2021, plaintiffs voluntarily dismissed their claims against Dinunzio and Holt without prejudice.  ECF Doc. 32; ECF Doc. 33.

On March 19, 2021, the court entered a stipulated protective order.  ECF Doc. 35.  Under the terms of the protective order, the parties could designate certain documents and electronically

---

[2] The third amended complaint also alleges that "Plaintiffs cannot include excerpts from emails from Daryl Todd and Stephanie Patterson due to the protective order in this case."  ECF Doc. 73-1 at 12.

stored information as confidential, the effect of which was that confidential material could not be used for any purpose other than to prepare for and conduct discovery, trial, and appeal.  ECF Doc. 35 at 1–3.  The protective order further provided that if it was necessary to refer to confidential information within the text of a pleading, "a party may timely move the Court for leave to file both a redacted version for the public docket and an unredacted version for sealing." ECF Doc. 35 at 5–6.

On April 30, 2021, plaintiffs filed a second amended complaint, which added Chun and Ting as defendants and named only one John Doe company.  ECF Doc. 39.  On September 27, 2021, the parties consented to magistrate judge jurisdiction.  Docket Entry dated 9/27/2021.

On March 25, 2022, the court granted plaintiffs leave to file a third amended complaint. Docket Entry dated 3/25/2022; ECF Doc. 73-1.  The third amended complaint names as defendants Todd, Michelle Todd, Patterson, APSL, Chun, Ting, Dinunzio, Holt, Millcraft, and SCC Packaging Solutions, LLC ("SPL").  ECF Doc. 73-1 at 1–2.  The complaint asserts ten claims:

| Claim | Defendants |
|---|---|
| Count I: Unfair Competition | All defendants |
| Count II: Tortious Interference with Contract | All defendants, excluding Millcraft |
| Count III: Breach of Contract | Chun, Todd, Dinunzio, Holt, Millcraft, Patterson, and Ting |
| Count IV: Breach of Fiduciary Duty | Chun, Todd, Dinunzio, Holt, and Ting |
| Count V: RICO (18 U.S.C. § 1962(c) & (d)[3] | All defendants |
| Count VII: Constructive Fraud | All defendants |

---

[3] The heading of plaintiffs' Count V RICO claim states that it was brought under "18 U.S.C. [§] 1962(c)." ECF Doc. 73-1 at 21.  The substantiating paragraphs, however, allege that each defendant violated "18 U.S.C. § 1962(c) and (d)."  *Id.*

| Count VIII: Conversion | All defendants |
|---|---|
| Count IX: Conspiracy | All defendants |
| Count X: Accounting | All defendants |

ECF Doc. 73-1 at 17–27.

In their attempt to state a claim under RICO[4], plaintiffs allege:

(i)     That each defendant is a "person" under 18 U.S.C. § 1961 who, together, formed "an enterprise, associated in fact and/or through APSL, for the common purpose of diverting funds and clients from the Plaintiff entities." ECF Doc. 73-1 at 21.

(ii)     "Defendants, in concert with, and in association with each other and with or from an investment of income from the association and/or Daryl Todd for the formation of APSL, did engage in a concerted enterprise to deprive Plaintiffs' of their monies and property." ECF Doc. 73-1 at 22.

(iii)     "Daryl Todd acted as the head of the enterprise and concocted the scheme by which the Defendants would collectively steer business away from Plaintiff[]s so as to financially ruin Plaintiffs' business and gain acquisition and control, either directly or indirectly, of the enterprise and/or APSL." *Id.*

(iv)     "By way of wires and email communication, the defendants did form an enterprise to deprive Plaintiffs of their monies and property, or to conspire to do so, all acts of which were related to each other and/or the affairs of the enterprise." ECF Doc. 73-1 at 21.

Count V further alleges that the predicate acts of racketeering were acts of mail and wire fraud. ECF Doc. 73-1 at 21 (citing 18 U.S.C. §§ 1341, 1343). Plaintiffs' allegations of "conduct" and "a pattern of racketeering" are:

Defendants undertook numerous wire and mail fraud transactions to effectuate the theft of Plaintiffs' properties and monies from Shanghai Commercial bank and others, and convert them to the personal use of Defendants, including APSL.

---

[4] The elements of a RICO claim brought pursuant to 18 U.S.C. § 1962(c) are: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *In re ClassicStar Mare Lease, Litig.*, 727 F.3d 473, 483 (6th Cir. 2013) (internal quotation marks omitted).

Specifically, Defendants engaged in a scheme to defraud Plaintiffs through the use of emails and VOIP applications to direct monies and property from Plaintiffs to themselves.

Further, Defendants engaged in a scheme to defraud Plaintiffs through the use of wires to direct monies from Plaintiffs to themselves.

Defendants committed these acts willfully and/or with actual knowledge as to the nature of their activities and that their activities would serve to divert monies and property from Plaintiffs to themselves.  Defendants' email communications reflect their intent to and knowledge of committing such acts.

Defendants' pattern of activities was undertaken from at least February 2020 through the present and poses a threat of continuing given that it has continued despite these proceedings and Daryl Todd's continued role as a director and shareholder of IMGA.

All of the aforementioned acts of racketeering were not isolated, but rather the acts of Defendants are related in that they had the same or similar purpose and result, participants and victims and methods of commission.  Further, the acts pose a threat of continued corrupt and illegal activity.

The scheme of all of the Defendants directly and proximately resulted in the diminution and cancellation of business contracts held by Plaintiffs, and in the deprivation of monies and property which rightfully belong to Plaintiffs.

The scheme also caused ABC customers to be charged amounts and rates greater than initially agreed upon, in the form of charges, tariffs and other steerage costs, so as to drive existing customers away from Plaintiff companies and eventually convert them to the customers of APSL and/or the enterprise, for the benefit of all Defendants.

The fact that Daryl Todd continues to maintain his position as a minority shareholder of IMGA while facilitating the scheme to benefit himself, his cohorts and the new APSL, allows for the inference that the Defendants are reasonably likely to engage in the continuation of the scheme.

Ongoing discovery has revealed that Defendants have continued the scheme as of the date of this Third Amended Complaint and that in an attempt to hide their continuing misconduct, Defendants have sought to form a successor company or companies to APSL.

ECF Doc. 73-1 at 22–23 (paragraph numbers omitted).

On May 27, 2022, Millcraft moved to dismiss the third amended complaint.  ECF Doc. 83.  Millcraft generally argues that: (i) Count V should be dismissed for failure to state a claim upon which relief can be granted; and (ii) dismissal of Count V would divest the court of subject matter jurisdiction over plaintiffs' remaining claims; it asserts that the court should decline to exercise supplemental jurisdiction over those claims.[5]  ECF Doc. 83 at 7–14.  On June 3, 2022, Todd, Dinunzio, Holt, Michelle Todd, and Patterson also moved to dismiss the third amended complaint.  ECF Doc. 85.  Their arguments for dismissal were largely the same as Millcraft's, except that they argued for dismissal of Count V with prejudice.  ECF Doc. 85-1 at 6–15.

On June 3, 2022, defendants, excluding APSL, SPL, Chun, and Ting, also filed answers to the third amended complaint.  ECF Doc. 86; ECF Doc. 87; ECF Doc. 88; ECF Doc. 89; ECF Doc. 90.  Millcraft's answer also asserted a counterclaim against plaintiffs for breach of contract, breach of an indemnification provision, and unjust enrichment.  ECF Doc. 84 at 24–27.

On June 8, 2022, plaintiffs filed a motion for default judgment against APSL, Chun, and Ting.  ECF Doc. 91.  On June 27 and July 5, 2022, plaintiffs filed their opposition briefs to defendants' motions to dismiss.  ECF Doc. 92; ECF Doc. 94.  Notably, plaintiffs made new factual allegations in their opposition briefs that were not included in the complaint, attached exhibits labeled "confidential," and cited statements made in (and exhibits attached to) other pleadings on the docket.  *See* ECF Doc. 92 at 9; ECF Doc. 94 at 5–7 (citing ECF Doc. 56 at 2; ECF Doc. 69-1); ECF Doc. 94-1; ECF Doc. 94-2; ECF Doc. 94-3; ECF Doc. 94-4; ECF Doc. 94-5; ECF Doc. 94-6; ECF Doc. 94-7; ECF Doc. 94-8.

The first exhibit attached to plaintiffs' opposition brief was an email conversation dated May 7, 2020 between Todd and Millcraft's president, Travis Mlakar, in which they discussed

---

[5] The parties' arguments for and against dismissal of the third-amended complaint will be discussed in more detail below.

various aspects of APSL.  ECF Doc. 94-1.  Todd stated that: (i) IMGA would not part of "this;"
(ii) Todd formed APSL, which was a company "wholly owned" by Todd; (iii) APSL would
include all the same people from IMGA, excluding Marinac and Zuber; (iv) Marinac could not
be a part of "this" because Patterson, Dinunzio, Holt, and Ting "simply do not trust him and …
despise him" over the way Marinac "pushed them;" (v) Dinunzio was fired in April 2020 and
Patterson and Holt were waiting on Todd to resign; (vi) Todd's role in APSL would be to work
with Chun and Ting on sourcing and operational functions; (vii) APSL's proposed fee was
copied from IMGA's; (vii) Todd would charge $10,000 per month; and (viii) Todd would be
willing to do consulting work for Millcraft.  ECF Doc. 94-1 at 1–4.

The second exhibit was a series of emails exchanged between Todd and Chun from June
8 through June 17, 2020.  ECF Doc. 94-2.  Todd asked Chun, in relevant part: "Once the
Millcraft money arrives I want a full recap on our fund … what do we have in each account in
IMGA."  ECF Doc. 94-2 at 1.  Todd stated that a recap was "very critical" because "we have a
new company and every dollar must be managed so we can have long term success."  *Id.*

The third exhibit was an email sent by Todd to Patterson and Holt on June 25, 2020.
ECF Doc. 94-3.  The email stated:

> It is official.  We are still working on the bank account.  … [O]nly Agnes and I
> have access to the IMGA bank account so we can act normal w/our banking until
> we do finally get the new bank account so there is no delays or issues.  DM and/or
> DZ cannot access the account and RB has never had access.  Anything RB gets
> comes from Shirley and Agnes and guess who pays them!!  Secondly, we advised
> RB that May was the last month I was paying for any services.  Going forward
> they can ask DM/DZ for details and as I told them hope they get paid.  I am
> paying over $12K/USD to cover the expenses and fees this year but my
> contributions end at the end of May.
> We can monitor anything going and coming but given they have no access to
> move money around anything they are doing w/ factories must be done from
> PNC direct to factory bank.

*Id.*

The fourth exhibit was three emails exchanged among Todd, Patterson, Ting, and Chun in July 2020.  ECF Doc. 94-4.  As relevant here, Patterson emailed Todd, Ting, and Chun on July 7, 2020 about two freight invoices for containers shipped to Millcraft.  ECF Doc. 94-4 at 1–2.  Patterson told Chun to review the invoices "as I know you will be paying factories so you can just pay Kesko as well while you are in the bank account."  ECF Doc. 94-4 at 2.

The fifth exhibit was a series of emails exchanged among Chun, Todd, Patterson, and employees of Kesco Logistics Inc. ("Kesco") regarding statements issued to APSL for shipments of product to School Outfitters.  ECF Doc. 94-5.  According to the emails, APSL "wired" funds from Hong Kong to Kesco on September 21, 2020 ($9,975), September 29, 2020 ($9,975), and October 24, 2020 ($5,000).  ECF Doc. 94-5 at 1–6.  On October 27, 2020, Patterson instructed Chun to wire another $5,000 to Kesco the following week.  ECF Doc. 94-5 at 1.

The sixth exhibit was a series of emails exchanged among Chun, Todd, Patterson, Ting in December 2020 regarding a "recap" of APSL's expenses and orders from June through December 2020.  ECF Doc. 94-6.  The recap included "the entire itemization of what was paid to Kesco for every IMGA/APSL order[] for [m]edical items."  ECF Doc. 94-6 at 2.  Todd instructed Chun and Ting to breakdown the recap into two parts, one with Millcraft's orders and one with orders from "SO" and "FD."  ECF Doc. 94-6 at 1.  After the breakdown, Todd stated that there were "19 entries in June and July" reflecting checks written to Todd or monies wire transferred to him.  Id.

The seventh exhibit was two emails shared among Todd, Chun, Ting, and employees of School Outfitters.  ECF Doc. 94-7.  School Outfitters initially emailed Chun on November 13, 2020 to inform her that a "[w]ire" had been sent.  Id.  On November 13, 2020, Todd asked Chun

and Ting to "check the bank" on Saturday, noting that the School Outfitters representative normally wired funds "from the HSBC account."  *Id.*

The eighth exhibit was an email sent by Todd to Patterson, Dinunzio, and Michelle Todd to ask for their input on the formation of a new company that would mirror ABC.  ECF Doc. 94-8.  Todd stated that he would offer Holt a position as a salesman on a commission-fee basis and that Patterson, Dinunzio, and Michelle Todd would be brought on to do "sales, inventory, Pos, etc[.]"  *Id.*

On July 11, 2022, Millcraft filed a reply brief in support of its motion to dismiss.  ECF Doc. 95.  On July 18, 2022, Todd, Dinunzio, Holt, Michelle Todd, and Patterson filed a reply brief in support of their motion to dismiss.  ECF Doc. 98.  On August 1, 2022, the court denied plaintiffs' motion for entry of default judgment without prejudice.  Docket Entry dated 8/01/2022.

## III.   Exhibits to be Considered

Todd, Dinunzio, Holt, Michelle Todd, and Patterson argue that the court should disregard the exhibits plaintiffs attached and referred to plaintiffs' opposition brief because the emails contained therein were unauthenticated.  ECF Doc. 96 at 4–6.

Generally, a court deciding a motion to dismiss for failure to state a claim for relief cannot consider matters outside the pleadings.  Fed. R. Civ. P. 12(d).  Otherwise, the court must treat the motion as a motion for summary judgment and give the parties a reasonable opportunity to present evidence.  *Id.*  But a court deciding a motion to dismiss may consider "any document not formally incorporated by reference or attached to the complaint as part of the pleadings if the document is referred to in the complaint and is central to the plaintiff's claim."  *Gardner v. Quicken Loans, Inc.*, 567 F. App'x 362, 365 (6th Cir. 2014) (internal quotation marks omitted).

12

Defendants are correct that the emails contained in the exhibits lack testamentary authentication.  Fed. R. Evid. 901(a).  But aside from the lack of a supporting affidavit, defendants have not disputed the substance, accuracy, or completeness of the emails.  *See generally* ECF Doc. 98.  The lack of authentication, therefore, does not preclude the court from considering the emails.  *Robins v. Global Fitness Holdings, LLC*, 838 F. Supp.2d 631, 642 (N.D. Ohio 2012).

Although authentication is not at present a barrier to the court's consideration of the email exhibits, only one of them satisfies the reference and integration requirements.  None of the emails attached to the second, third, fourth, fifth, sixth, seventh, and eighth exhibits was referred to in the complaint.  *Compare* ECF Doc. 73-1, *with* ECF Doc. 94-2; ECF Doc. 94-3; ECF Doc. 94-4; ECF Doc. 94-5; ECF Doc. 94-6; ECF Doc. 94-7; ECF Doc. 94-8.  Thus, the court cannot consider them without converting defendants' motions.  *Gardner*, 567 F. App'x at 365; *see also Bricker v. R&A Pizza, Inc.*, 804 F. Supp.2d 615, 619 (S.D. Ohio 2011).  The one exception is the first exhibit to plaintiffs' opposition brief.  Todd's email to Millcraft in May 2020 was expressly referenced in the complaint and is central to plaintiffs' claim that Millcraft participated in the creation of an entity-RICO enterprise.  *Compare* ECF Doc. 73-1 at 10, 21, *with* ECF Doc. 94-1.  The court, therefore, will consider (and may only consider) plaintiffs' first exhibit to be part of the pleadings in ruling on the motions to dismiss.  *Gardner*, 567 F. App'x at 365.

Plaintiffs also cite an email attached to their opposition to defendants' motion for a determination that documents produced by a non-party were subject to the protective order.  ECF Doc. 94 at 6 (citing ECF Doc. 69-1).  The email was sent by Todd to Chun, Holt, Patterson, Ting and several IMGA employees in which Todd stated that: (i) ABC was in financial trouble

primarily because Marinac had been taking an overly large salary and making personal use of company funds; (ii) Marinac had become abusive to Patterson and Holt, fired Dinunzio, and refused to speak with Todd; (iii) Todd was going to start APSL to replace IMGA because Marinac would not return ownership of IMGA to Todd; (iv) each of IMGA's employees would resign and be rehired by APSL; (v) Millcraft agreed to be APSL's customer and provide start-up funding; and (vi) Millcraft also agreed to set up a separate company to employ Patterson, Dinunzio, and Holt in the United States focusing on the same packaging. ECF Doc. 69-1 at 1–2. Because this email also was not referred to in the complaint, the court cannot consider it in deciding the motions to dismiss. *Gardner*, 567 F. App'x at 365

## IV. Merits

### A. Rule 12(b)(6) Standard

A complaint is subject to dismissal if it fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). When reviewing a motion under Rule 12(b)(6), court must "construe the complaint in the light most favorable to [the] plaintiff[], accept all the well-pleaded factual allegations as true, and draw all reasonable inferences in [the] plaintiff['s] favor." *Guertin v. Michigan*, 912 F.3d 907, 916 (6th Cir. 2019). But the court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain*, 478 U.S. 265, 286 (1986). To survive, the complaint must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible when a plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

### B.     RICO Generally

RICO provides a private cause of action for treble damages and attorney fees to "[a]ny person injured in his business or property by reason of a violation of" one of the four provisions of 18 U.S.C. § 1962.  18 U.S.C. § 1964(c).  A substantive RICO claim brought under § 1962(c) has four elements: "'(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.'"  *Courser v. Allard*, 969 F.3d 604, 621 (6th Cir. 2020) (quoting *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 496 (1985)).  The same four elements are required to establish a RICO conspiracy claim brought under § 1962(d), in addition to "the existence of an illicit agreement to violate the substantive RICO provision."  *Aces High Coal Sales, Inc. v. Cmty. Bank & Trust*, 768 F. App'x 446, 459 (6th Cir. 2019) (internal quotation marks omitted).  And these elements must be satisfied as to *each* defendant.  *E.g.*, *Compound Prop. Mgmt., LLC v. Build Realty, Inc.*, 462 F. Supp.3d 839, 858 (S.D. Ohio 2020); *Kerrigan v. Visalus, Inc.*, 112 F. Supp.3d 580, 602 (E.D. Mich. 2015); *see also De Falco v. Bernas*, 244 F.3d 286, 306 (2d Cir. 2001).

In deciding a motion to dismiss a RICO claim, courts are mindful that RICO must be "liberally construed to effectuate its remedial purposes"—giving redress to those victimized by racketeering activity.  RICO, Pub. L. No. 91-452 § 904(a), 84 Stat. 947; *Sedima, S.P.R.L.*, 473 U.S. at 498.  But "the statute was never intended to allow plaintiffs to turn garden-variety state law fraud claims into federal RICO actions."  *Jennings v. Auto Meter Prods., Inc.*, 495 F.3d 466, 472 (7th Cir. 2007); *see also Midwest Grinding Co. v. Spitz*, 976 F.2d 1016, 1025 (7th Cir. 1992) ("[I]t is equally evident that RICO has not federalized every state common-law cause of action available to remedy business deals gone sour.").

15

C.      **Substantive RICO Claim**

Defendants attack plaintiffs' RICO claim by focusing on the lack of sufficient allegations of the "enterprise" and "pattern of racketeering" elements; thus, the court will focus its analysis on those two elements.

1.      **Enterprise**

Defendants argue that APSL cannot serve as the "enterprise" for plaintiffs' RICO claim because APSL cannot be both a "person" who conducted the affairs of the enterprise and the "enterprise" itself.  ECF Doc. 83 at 9; ECF Doc. 85-1 at 12–13.  Defendants also argue that plaintiffs have failed to adequately allege the existence of an association-in-fact enterprise because there no facts establishing an organizational structure and each defendant's role in the enterprise.  ECF Doc. 83 at 9–11; ECF Doc. 85-1 at 13–14.

Plaintiffs argue APSL can serve as the RICO enterprise because none of the moving defendants is an employee or director of APSL.  ECF Doc. 94 at 8.  Plaintiffs also argue that the third amended complaint alleges facts sufficient to establish each defendant's role in an association-in-fact enterprise: (i) Todd and Michelle Todd directed the enterprise; (ii) Todd used his bank account to hide funds; (iii) Millcraft funded the formation of APSL and Todd's efforts partly through "wiring funds illegally in Hong Kong;" (iv) Millcraft currently directs Chun, Ting, and Patterson to source products from Asia; (v) Patterson provided shipping and customs-related services; (vi) Chun acted as the enterprise's bookkeeper and diverted payments away from IMGA to APSL; (vii) Ting sourced products from Asia, at times at Millcraft's direction; (viii) Holt was a "primary customer contact, a salesman, and one who directs orders to entities other than Millcraft;" and (ix) Dinunzio assisted with sales, supervised product, helped APSL

16

develop its website and product offerings, and diverted customers away from IMGA to fund the enterprise.  ECF Doc. 92 at 7–8; ECF Doc. 94 at 8–9.

### a.      Entity Enterprise

RICO defines "enterprise" to include "any individual, partnership, corporation, association, or other legal entity."  18 U.S.C. § 1961(4).  It also defines "person" to include "any individual or entity capable of holding a legal or beneficial interest in property."  18 U.S.C. § 1961(3).  Because only "persons" who conduct the affairs of an "enterprise" through a pattern of racketeering can be liable under § 1962(c), a plaintiff must allege the existence of two distinct entities: (i) a "person" against whom the claim is asserted; and (ii) "an 'enterprise' that is not simply the same "person" referred to by a different name."  *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 161 (2001).  In practical terms, this means that "a party cannot sue Corporation X in a Civil RICO action in which Corporation X is alleged to be the enterprise." *Compound Prop. Mgmt., LLC*, 462 F. Supp.3d at 856.

The third amended complaint sufficiently alleges the existence of an entity enterprise.  As a corporation, APSL can serve as an entity enterprise.  18 U.S.C. § 1961(4); *see* ECF Doc. 73-1 at 3, 13.  Although APSL is also one of the named RICO defendants in Count V and alleged to be a "person" under § 1961(3), that would only affect APSL's liability as to Count V. *Compound Prop. Mgmt., LLC*, 462 F. Supp.3d at 856; ECF Doc. 73-1 at 21.  It would not be fatal to plaintiffs' RICO claim against the other defendants.

### b.      Association-in-Fact Enterprise

RICO's definition of "enterprise" also includes "any union or group of individuals associated in fact although not a legal entity."  18 U.S.C. § 1961(4).  An association-in-fact enterprise is, in simple terms: "a group of persons associated together for a common purpose of

17

engaging in a course of conduct." *United States v. Turkette*, 452 U.S. 576, 583 (1981).  It is characterized by three structural features: "a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle v. United States*, 556 U.S. 938, 956 (2009) (internal quotation marks omitted). The degree of structure necessary is greater than that of simple conspiracy, but it "need not be hierarchical, can make decisions on an ad hoc basis, and does not require the members to have fixed roles." *Ouwinga v. Benistar 419 Plan Servs.*, 694 F.3d 783, 794 (6th Cir. 2012) (citing *Boyle*, 556 U.S. at 948).

Plaintiffs have plausibly alleged an association-in-fact enterprise.  The third amended complaint alleges one common purpose: to defraud plaintiffs of their money and take their business by diverting funds and clients away from plaintiffs.[6]  ECF Doc. 73-1 at 7, 21–22.  It also alleges "interpersonal relationships and a common interest" with the enterprise.  *Boyle*, 556 U.S. 946 (defining the requisite showing of "association").  Chun, Dinunzio, Holt, Michelle Todd, Millcraft, Patterson, and Ting all share the common interrelationship of being associated with Todd and (excluding Michelle Todd and Millcraft) are former employees or clients of either ABC or IMGA.  The factual contentions in the third amended complaint sufficiently allege a common interest: the formation of a business to compete with ABC and/or IMGA.  And the complaint alleges sufficient longevity to permit the associates to carry out the enterprise's purpose – from February 2020 to the present.  ECF Doc. 73-1 at 23.

---

[6] Plaintiffs argue that Millcraft was engaged in a wholly separate enterprise: "to secure cheap PPE, craft beer supplies, and cannabis packaging from Asia that it could not obtain legally on its own."  ECF Doc. 94 at 5.  Nowhere in the complaint is Millcraft alleged to be part of an enterprise the purpose of which was anything other than stealing from plaintiffs by forming a competing business.  *See generally* ECF Doc. 73-1.  Plaintiffs' attempt at amending their complaint for a fifth time through their opposition brief is not well-taken.  *Bates v. Green Farms Condo. Ass'n*, 958 F.3d 470, 483 (6th Cir. 2020).

The closer question is whether the facts alleged establish a sufficient degree of coordination among the enterprise associates.  It is clear that Todd was the head of the association-in-fact enterprise.  ECF Doc. 73-1 at 22.  Chun and Ting acted on Todd's instructions to form APSL, to redirect prospective business quotes to APSL, and to conduct APSL's financial transactions using IMGA's bank account.  ECF Doc. 73-1 at 9–12, 17.  Patterson, at Todd's behest, agreed to provide logistical support to APSL in conjunction with Chun and Ting.  ECF Doc. 73-1 at 11–12.  Holt and Dinunzio assisted Patterson in setting up APSL's website, shipping, and product offerings.  ECF Doc. 73-1 at 9, 15.  And Holt conducted one business transaction through APSL, in cooperation with Todd, Ting, and Patterson.  ECF Doc. 73-1 at 13.

Michelle Todd's and Millcraft's involvement is less clear.  The only allegation in the complaint implicating Michelle Todd is the allegation that she helped pick out a name for APSL.  ECF Doc. 73-1 at 15.  And Millcraft's involvement was limited to providing initial funding to APSL and afterwards doing business with APSL and SPL that otherwise would have been done through ABC and IMGA after being misled by Todd as to plaintiffs' ability to perform on their contractual obligations.  ECF Doc. 73-1 at 10, 13, 16; *see also Crichton v. Golden Rule Ins. Co.*, 576 F.3d 392, 400 (7th Cir. 2009) (holding that plaintiff failed to allege the existence of a RICO enterprise arising from a business relationship in which one entity was merely a conduit for the fraudulent scheme of the other); *In re Duramax Diesel Litig.*, 298 F. Supp.3d 1037, 1081 (E.D. Mich. 2018) ("A RICO enterprise does not exist where one company unknowingly aided another company in a fraudulent endeavor.").  However, because "enterprise" must be read and applied expansively, and because the degree of participation in the enterprise is implicated in the "pattern of racketeering" element, the court finds that the third amended complaint plausibly alleged the existence of an association-in-fact enterprise.  *Boyle*, 556 U.S. at 944; *see also id.* at 947 (stating

19

that although the existence of an enterprise is separate from the pattern of racketeering activity,

the evidence used to prove one or the other may in some cases coalesce).

### 2.   Pattern of Racketeering Activity

Defendants argue that the third amended complaint has failed to allege facts establishing

a pattern of racketeering.  ECF Doc. 83 at 11–13; ECF Doc. 85-1 at 6–12.  Defendants argue that

plaintiffs have failed to satisfy the heightened pleading requirements for stating a predicate mail

or wire fraud to support a RICO claim because plaintiffs have failed to identify the specific acts

of wire fraud, their author, when they were sent and to whom, and what aspect of the

communications was fraudulent.  ECF Doc. 83 at 12–13; ECF Doc. 85-1 at 7–8.  Defendants

argue that plaintiffs have also failed to allege scienter with respect to each individual defendant.

ECF Doc. 85-1 at 9.  And defendants argue that plaintiffs have failed to allege at least two

related acts of racketeering activity and that there is a continuing threat of future racketeering

acts.  ECF Doc. 85-1 at 11–12.

Plaintiffs respond that they did not include specific acts of mail and wire fraud because

they are subject to the protective order.  ECF Doc. 92 at 9; ECF Doc. 94 at 5.  They argue that

they have disclosed the specific acts of racketeering activity to defendants, who do not dispute

that: (i) on January 29, 2020, $24,975 was wired from IMGA's bank account to Todd's personal

bank account; (ii) on April 20, 2020, $15,000 was wired "by Agnes from Hong Kong to the

Todd[]s' personal checking account for APSL business;" and (iii) on May 21 and July 8, 2020,

$24,975 was wired to Todd's personal checking account for APSL business.  ECF Doc. 92 at 9;

ECF Doc. 94 at 5.  Plaintiffs additionally cite as examples: (i) Todd's instruction to Ting to

provide a prospective customer IMGA quotes, even though the business would go through

APSL; (ii) Todd's May 7, 2020 email to Millcraft; (iii) Todd's May 16, 2020 email to Ting,

Chun, Patterson, and Holt; and (iv) the emails attached to their opposition brief.  ECF Doc. 94 at 5–7.

Defendants in their reply disagree with plaintiffs' assertion that the new allegations of mail and wire fraud are undisputed.  ECF Doc. 95 at 7–8; ECF Doc. 96 at 4–6.

### a.      Racketeering Activity

Mail fraud and wire fraud can serve as predicate acts of racketeering to establish RICO liability.  18 U.S.C. § 1961(1).  To establish either form of fraud, a complaint must allege the existence of: "(1) a scheme or artifice to defraud; (2) use of the mails or interstate wire communications in furtherance of the scheme; and (3) intent to deprive a victim of money or property." *Slorp v. Lerner, Sampson & Rothfuss*, 587 F. App'x 249, 264 (6th Cir. 2014).  "A scheme to defraud includes any plan or course of action by which someone uses false, deceptive, or fraudulent pretenses, representations, or promises to deprive someone else of money." *United States v. Jamieson*, 427 F.3d 394, 402 (6th Cir. 2005).  "This means not only that a defendant must knowingly make a material misrepresentation or knowingly omit a material fact, but also that the misrepresentation or omission must have the purpose of inducing the victim of the fraud to part with property or undertake some action that he would not otherwise do absent the misrepresentation or omission." *United States v. DeSantis*, 134 F.3d 760, 764 (6th Cir. 1998).  And the plaintiff must establish that the defendant acted with either a specific intent to defraud or with recklessness with respect to the potentially misleading information. *Id.*

When the RICO predicates are fraud-based, they are subject to a heightened pleading requirement. *Heinrich v. Waiting Angels Adoption Servs., Inc.*, 668 F.3d 393, 404 (6th Cir. 2012).  A plaintiff must "(1) specify the statements that the plaintiff contends were fraudulent,

(2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Id.* (internal quotation marks omitted).

Plaintiffs have not plausibly alleged a predicate act of racketeering activity.  But first, a word on plaintiffs' reliance on factual allegations outside the third amended complaint.  As discussed above, the court cannot consider seven out of the eight exhibits attached to plaintiffs' opposition brief.  Plaintiffs cite as an example of mail and wire fraud an allegation defendants made in a motion for a telephone status conference to address a discovery dispute.  ECF Doc. 94 at 5 (citing ECF Doc. 56 at 2 (stating that bank statements showed that Todd received $25,000 from IMGA's bank account in July 2020)).  Despite knowing that information, plaintiffs did not include that allegation in the third-amended complaint.  If plaintiffs' RICO claim is to survive, it must survive based on what was actually alleged in the complaint.  *See Bates v. Green Farms Condo. Ass'n*, 958 F.3d 470, 484 (6th Cir. 2020).  Similarly, plaintiffs list a series of wire transfers with citations to discovery material that is neither part of the docket nor referenced in the complaint.  ECF Doc. 92 at 9; ECF Doc. 94 at 5.  The court cannot consider them.  *See Bates*, 958 F.3d at 484.

Plaintiffs argue that they were disabled from alleging specific examples of mail and wire fraud because of the protective order.  ECF Doc. 94 at 9; ECF Doc. 94 at 5.  But the protective order is not as restrictive as plaintiffs believe.  The protective order includes a procedure by which a party may reference confidential material in a pleading: filing an unredacted version of the pleading under seal.  ECF Doc. 35 at 5–6.  Plaintiffs didn't avail themselves of that procedure.  They cannot use the protective order as an excuse for omitting necessary factual allegations to state a claim upon which relief can be granted.

22

That brings us to what the third-amended complaint actually alleges.  Plaintiffs assert that the third amended complaint "is replete with specific examples" of racketeering activity.  ECF Doc. 94 at 4–5.  That contention is based on 15 factual allegations in the complaint.  ECF Doc. 94 at 5.  None sufficiently alleges an act of mail fraud or wire fraud.

The supporting paragraphs to Count V generically refer to "Defendants" collectively and fail to identify a single allegedly fraudulent communication or describe an allegedly fraudulent communication with the degree of particularity required to allege a plausible mail or wire fraud claim.  *See* ECF Doc. 73-1 at 22–23.  Because Count V is alleged against all ten defendants, plaintiffs were required to allege facts establishing predicate acts of racketeering by each individual defendant.  Plaintiffs' generic pleading falls far short of alleging a cognizable RICO claim.  *Cf. Smith v. Liberty Mortg. Co.*, No. 2:19-cv-3547, 2020 U.S. Dist. LEXIS 84714, at *25 (S.D. Ohio May 13, 2020).

Plaintiffs point to the allegation that: "Daryl Todd falsely told Millcraft that IMGA and David Marinac were unable to perform their contracts with Millcraft, that David Marinac was engaged in significant misconduct, and was on the brink of financial ruin, among other things." ECF Doc. 73-1 at 8; *see* ECF Doc. 94 at 5.  Plaintiffs alleged the what, but not the where, when, and why.  Plaintiffs have not alleged when the allegedly fraudulent statement was made, to whom at Millcraft, and why the statement was fraudulent.  *See Heinrich*, 668 F.3d at 405.

Plaintiffs point to the allegation that:

[I]n April of 2020, Daryl Todd emailed Lunkerhunt LP, a Canadian company that sells fishing supplies, to offer them PPE.  When Lunkerhunt LP expressed an interest in pricing, Daryl Todd contacted Alfred Ting and told him to provide the same quotes he prepared for Dave Marinac and Millcraft but that the business would not go through IMGA and instead should go through is Daryl Todd's new company APSL that Alfred Ting would be a part of.

23

ECF Doc. 73-1 at 10; *see* ECF Doc. 94 at 5.  That allegation contains a who, when, and where, but not a what and a why.  Plaintiff has not alleged what about Todd's email to Lunkerhunt LP or Ting was false or why the statement was fraudulent.  *See Heinrich*, 668 F.3d at 405.

And plaintiffs point to the allegation that:

Millcraft's employee email signatures state "Are you ready for the 'new normal' check out Millcraft's Personal Protective Equipment offer list from KN95 and 3ply masks to hand sanitizer and wipes, thermometers to protective shields – JUST ASK!" This message includes links to a website that offers PPE to customers (www.millcraft.com/ppe). The webpage states in dozens of places:

> We have contract employees who have been working for us in China developing sources for our retail packaging customers (Food, grocery, cannabis, craft beverage, etc.). Our team in China has pivoted to source much needed supplies for the current health crisis in the United States including corporations, schools, associations and retailers looking to protect employees or to support new safety protocols going forward. The suppliers we work with all have certifications that have been verified, quality checked by our staff and have provided the required manufacturing documentation (each of these documents along with factory video footage is available upon request).

ECF Doc. 73-1 at 16; *see* ECF Doc. 94 at 5.  The third amended complaint has failed to allege facts articulating what about Millcraft's signature was fraudulent and why.  *See Heinrich*, 668 F.3d at 405.  Instead, plaintiffs allege that it is an example of APSL fulfilling duties that would have been performed by IMGA for Millcraft, which is more an example of the consequences of Todd's alleged tortious interference with IMGA's contract with Millcraft and APSL's unfair competition than it is an example of mail and wire fraud.  ECF Doc. 73-1 at 16.

The remaining factual allegations plaintiffs claim are acts of mail fraud or wire fraud can be addressed together:

(i)      "Despite resigning, Defendants continued their work with Plaintiff's customers representing to said customers that they were still employed, but with the intent to divert the business to their new company APSL." ECF Doc. 73-1 at 8.

24

(ii)  "Defendants coordinated their misconduct primarily through email correspondence and instant messages utilizing free VOIP applications." ECF Doc. 73-1 at 9.

(iii)  "Daryl Todd utilized the email address "dztoddimga@yahoo.com" so that he could pretend to be affiliated with IMGA after he resigned and to further the corrupt enterprise."  ECF Doc. 73-1 at 9.

(iv)  "In May of 2020, Daryl Todd was pitching APSL's business to Millcraft stating that he formed a new company and that it is the same people minus David Marinac and David Zuber.  Daryl Todd represented to Millcraft that APSL was wholly owned by him."  ECF Doc. 73-1 at 10.

(v)  "On June 2, 2020, Stephanie Patterson wrote to Kesco Logistics Inc. stating that she had left ABC and was working for her dad's company APSL to handle shipments with Millcraft and School Outfitters."  ECF Doc. 73-1 at 12.

(vi)  "On June 3, 2020, Agnes Chun emailed Millcraft stating that she was now working for APSL and that Stephanie Patterson was working with APSL." ECF Doc. 73-1 at 13.

(vii)  "In July of 2020, Daryl Todd asked his Hong Kong accountant Russel Bedford to provide him with evidence that APSL is owned by Agnes and Alfred so that Millcraft could tell its lawyer that any orders between Millcraft and APSL had nothing to do with Daryl Todd."  ECF Doc. 73-1 at 13.

(viii)  "In July of 2020, Stephanie Patterson filled out and submitted a Customs Bond Application & Indemnity form to Kesco Logistics, Inc. on behalf of APSL."  ECF Doc. 73-1 at 13.

(ix)  "Daryl Todd also made the mistake of using his company email account in the early stages of his scheme."  ECF Doc. 73-1 at 15.

(x)  "[E]mail correspondence … included conversations with Daryl Todd's wife and daughter picking out the name for APSL to replace IMGA, instructing Agnes Chun and Alfred Ting not to respond to quote requests and communications from David Marinac, instructing Robert Holt and Sarah Dinunzio to pressure David Marinac to resign and give up his ownership in IMGA, and generally bad mouthing David Marinac to Anyone and everyone."  ECF Doc. 73-1 at 15–16.

See ECF Doc. 94 at 5.  All these factual allegations failed to identify a communication made by any of the named defendants that plaintiffs contend is false.  See Heinrich, 668 F.3d at 405.

25

They failed to articulate a basis for why any alleged statement was false.  *See id.*  And in the case of (i), (ii), (iii), (ix), and (x), the allegations also failed state when an allegedly false statement was conveyed.  *See id.*

Lastly, plaintiffs rely on Todd's May 7, 2020 email to Millcraft.  ECF Doc. 94 at 6.  But plaintiffs have not alleged what in the email was fraudulent and why.  *See Heinrich*, 668 F.3d at 405; *see generally* ECF Doc. 73-1.  Thus, plaintiffs have failed to plausibly allege a predicate act of mail or wire fraud sufficient to support a RICO claim.

### b.  Pattern

To establish a pattern of racketeering activity, a plaintiff must allege facts showing that the defendant committed at least two predicate offenses.  18 U.S.C. § 1961(5).  The plaintiff must also plead "'a relationship between the predicates and the threat of continuing activity.  It is this factor of *continuity plus relationship* which combines to produce pattern.'"  *Bachi-Refitt v. Reffitt*, 802 F. App'x 913, 918 (6th Cir. 2020) (emphasis in original; quoting *Moon*, 465 F.3d at 724).

Because plaintiffs have failed to plausibly allege a single predicate act of mail fraud or wire fraud, they necessarily have failed to sufficiently allege a pattern of racketeering activity.  *See* 18 U.S.C. § 1961(5).  Because plaintiffs have failed to allege facts sufficient to establish a pattern of racketeering activity, they have failed to allege a plausible civil RICO claim under 18 U.S.C. § 1962(c).  Plaintiffs' Count V RICO claim must be DISMISSED as to its substantive RICO claim.

Pleading a RICO claim is no small feat.  "RICO claims are very serious charges and can be very burdensome to all parties if they are pursued without a firm basis in law and fact."  *Lucas-Cooper v. Palmetto GBA*, No. 1:05-cv-00959, 2006 U.S. Dist. LEXIS 51531, at *5 (N.D.

Ohio July 27, 2006); *see Bachi-Refitt*, 802 F. App'x at 919 (describing a RICO claim as the "litigation equivalent of a thermonuclear device" (internal quotation marks omitted)).  When multiple defendants are involved, a plaintiff must "plead the specific facts as to each defendant." *Walker v. Beaumont Indep. Sch. Dist.*, 938 F.3d 724, 737 (5th Cir. 2019); *see also Ambrosia Coal & Constr. Co. v. Morales*, 482 F.3d 1309, 1317 (11th Cir. 2007) ("[T]he complaint should inform each defendant of the nature of his alleged participation in the fraud." (internal quotation marks omitted)).  What one may not is what plaintiffs have attempted to do here: group defendants together without specifying what the basis is for each defendant's individual liability. *Kerrigan*, 112 F. Supp.3d at 602 ("[E]ach Defendant is entitled to an individualized analysis of his, her, or its own RICO liability."); *see, e.g.*, *Walker*, 938 F.3d at 737; *Kivisto v. Miller, Canfield, Paddock & Stone, PLC*, 413 F. App'x 136, 139 (11th Cir. 2011); *Swartz v. KPMG LLP*, 476 F.3d 756, 764–65 (9th Cir. 2007); *Corp. Auto Res. Specialists, Ltd. v. Masson*, No. 19-10452, 2019 U.S. Dist. LEXIS 147220, at *7 (E.D. Mich. Aug. 29, 2019).

### A.      Conspiracy RICO Claim

The court notes that plaintiffs have not attempted to defend against defendants' request for dismissal of their RICO-conspiracy claim.  *See generally* ECF Doc. 92; ECF Doc. 94. Regardless, because plaintiffs have failed to successfully allege all the elements of a substantive RICO violation, plaintiffs have necessarily failed to plausibly allege a RICO-conspiracy claim. *Fuji Photo Film U.S.A., Inc. v. McNulty*, 640 F. Supp.2d 300, 311 (S.D. N.Y. 2009) ("[A] plaintiff's RICO conspiracy claim fails if the plaintiff's substantive RICO claims are deficient."); *see also Grubbs v. Sheakley Grp., Inc.*, 807 F.3d 785, 805-06 (6th Cir. 2015).  Thus, Plaintiffs' Count V RICO claim must be DISMISSED as to its conspiracy-to-violate-RICO claim.

B.      **Non-Moving Defendants**

In reviewing the sufficiency of the RICO allegations in plaintiffs' third-amended

complaint, the court has determined that there is no sufficient allegation of a single predicate act

of racketeering activity.  This pleading defect affects the plausibility of Count V as to all of the

defendants, not just those who have moved to dismiss.  Thus, the court, on its own motion, will

DISMISS plaintiffs' Count V claim in its entirety as asserted against all of the named defendants

in the third-amended complaint.  *Bonny v. Society of Lloyd's*, 3 F.3d 156, 162 (7th Cir. 1993)

("A court may grant a motion to dismiss even as to non-moving defendants where the

nonmoving defendants are in a position similar to that of moving defendants or where the claims

against all defendants are integrally related."); *see also, e.g.*, *Melton v. Blankenship*, No. 08-

5346, 2009 U.S. App. LEXIS 686, at *11 (6th Cir. Jan. 13, 2009) (unreported); *JRS Partners,

GP v. Leech Tishman Fuscaldo & Lampl, LLC*, No. 3:19-cv-00469, 2021 U.S. Dist. LEXIS

96059, at *8 (M.D. Tenn. May 20, 2021); *Gold Crest, LLC v. Project Light, LLC*, 525 F.

Supp.3d 826, 832 (N.D. Ohio 2021); *Sedore v. Burt*, No. 1:16-cv-903, 2018 U.S. Dist. LEXIS

64485, at *20 n.5 (W.D. Mich. Mar. 20, 2018); *Kalitta Air, LLC v. GSBD & Assocs., LLC*, No.

12-CV-13554, 2013 U.S. Dist. LEXIS 204265, at *8 (E.D. Mich. Dec. 5, 2013).

C.      **With or Without Prejudice**

Defendants ask that dismissal of plaintiffs' RICO claim be with prejudice.  ECF Doc. 85-

1 at 19.  Plaintiffs have not responded to this argument.  *See generally* ECF Doc. 92.

The court finds it unnecessary to specify the plaintiffs' Count V claim is dismissed with

or without prejudice.  A dismissal for failure to state a claim under Federal Rule of Civil

Procedure 12(b)(6) operates as an adjudication on the merits, *i.e.*, a dismissal *with* prejudice.

*Pratt v. Ventas, Inc.*, 365 F.3d 514, 522 (6th Cir. 2004).  Plaintiffs have not requested leave to

file a fourth amended complaint.  Plaintiffs' attempt to inject new factual allegations in their opposition briefs does not constitute a request for leave to file an amended complaint.  *Evans v. Pearson Enters.*, 434 F.3d 839, 853 (6th Cir. 2006) (stating that requests for leave to amend must comply with the requirements of Fed. R. Civ. P. 7(b)); *see also Tilden v. Gen. Elec. Co.*, No. 3:11-CV-628, 2012 U.S. Dist. LEXIS 40773, at *21 (E.D. Tenn. Mar. 26, 2012) ("[T]he Sixth Circuit does not look favorably upon bare requests for leave to amend in response to a motion to dismiss when the requesting party could have filed a proper motion to amend and attached a proposed amended complaint for consideration by the court.").  And the court has no obligation to invite one when one has not been requested.  *Tucker v. Middleburg-Legacy Place, LLC*, 539 F.3d 545, 551 (6th Cir. 2008) ("No abuse of discretion occurs when a district court denies a party leave to amend where such leave was never sought.").

## II.      Jurisdiction

Defendants argue that plaintiffs' case should be dismissed in its entirety because without a plausible RICO claim the court lacks subject matter jurisdiction.  ECF Doc. 83 at 14; ECF Doc. 85-1 at 15.  Plaintiffs argue defendants' motion would not impact their RICO claim against APSL, Ting, and Chun.  ECF Doc. 92 at 9–10; ECF Doc. 94 at 9–10.

A district court "may decline to exercise supplemental jurisdiction" if it "has dismissed all claims over which it had original jurisdiction."  28 U.S.C. § 1367(c)(3).  In determining whether to exercise supplemental jurisdiction, we consider four factors: "the values of judicial economy, convenience, fairness, and comity."  *City of Chi. v. Int'l College of Surgeons*, 522 U.S. 156, 173 (1997).  "When all federal claims are dismissed before trial, the balance of considerations usually will point to dismissing the state law claims."  *Gamel v. City of Cincinnati*, 625 F.3d 949, 952 (6th Cir. 2010) (internal quotation marks omitted).

The relevant factors weigh in favor of dismissal of plaintiffs' state law claims.  No judicial economy would be gained if this court – as opposed to a state court – decided plaintiffs' remaining claims.  Although the case has been pending for over two years, "the parties [have] not exerted substantial time or effort in briefing the merits of the state law causes of action." *Packard v. Farmers Inc. Co. of Columbus*, 423 F. App'x 580, 585 (6th Cir. 2011).  And plaintiffs have not shown "how any substantial savings in judicial resources would be gained that outweigh the interest in avoiding unnecessary resolution of state law issues, nor any undue amount of wasted or duplicative effort that will result from having to re-file in state court." *Id.* (ellipsis omitted; internal quotation marks omitted).  Fairness and convenience do not tip the balance either way.  Comity, however, strongly favors dismissal of state law claims. *Id.* at 584. Accordingly, the court declines to exercise supplemental jurisdiction over plaintiffs' remaining claims.  Likewise, the court declines to exercise supplemental jurisdiction over Millcraft's state law counter claims.  *See* ECF Doc. 84 at 20 (conceding that the court would lacked subject matter jurisdiction over Millcraft's counterclaims upon dismissal of plaintiffs' RICO claim.

## III.    Conclusion

Defendants' motions to dismiss (ECF Doc. 83; ECF Doc. 85) are GRANTED.

Plaintiffs' Count V RICO claim is DISMISSED as to Todd, Michelle Todd, Patterson, Dinunzio, Holt, and Millcraft upon motion of the defendants

On the court's own motion, plaintiffs' Count V RICO claim is also DISMISSED as to APSL, Chun, Ting, and SPL.

Plaintiffs' state law claims are DISMISSED WITHOUT PREJUDICE pursuant to 28 U.S.C. § 1367(c)(3).

Millcraft's counterclaims are DISMISSED WITHOUT PREJUDICE pursuant to 28 U.S.C. § 1367(c)(3).

And Millcraft's motion to modify the deadlines in the court's case management schedule (ECF Doc. 99) is DENIED AS MOOT.

**IT IS SO ORDERED.**

Dated: August 30, 2022

Thomas M. Parker
United States Magistrate Judge